UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MONEYCORP US, INC. & MONETA TOPCO LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL USMAR & MONEX INC. d/b/a Monex USA,<br><br>Defendants. | C.A. No. 1:24-cv-00418-JJM-PAS |

**<u>PLAINTIFFS MONEYCORP US, INC. AND MONETA TOPCO LIMITED'S
MEMORANDUM IN SUPPORT OF THEIR MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

4856-5384-1646.3

## INTRODUCTION

Plaintiffs Moneycorp US, Inc. ("Moneycorp") and Moneta Topco Limited ("Moneta") (collectively "Plaintiffs") respectfully submit this Memorandum in Support of their Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion"), seeking issuance of a temporary restraining order and preliminary injunction to restrain Defendant Michael Usmar ("Usmar") from competing with Plaintiffs through his employment with Plaintiffs' direct competitor, Monex Inc. ("Monex"), and restrain both Defendants Usmar and Monex from their further use and misappropriation of Plaintiffs' confidential and proprietary trade secret information.

Plaintiffs have maintained their position as a leading global payments business that offers cross-border payment and foreign exchange services to individuals and corporate entities through the use of local affiliates in various regions. Moneycorp serves the United States and Canadian markets. Plaintiffs derive a significant competitive advantage from, among other things, specialized knowledge of the FX markets, the various trading strategies available to the clients, and how those strategies impact various aspects of the client's balance sheet. Plaintiffs are able to do so in large part based upon their confidential and proprietary information including their credit terms, collateral terms, underwriting process, margins on different currencies, and credit line limits. These successful strategies and proprietary functions rely significantly upon an intimate knowledge of a client's confidentially provided information, such as contact information, authority levels, transaction history, current and historical trades, compliance information, approved credit lines, and financial statements, which also constitute Plaintiffs' confidential and proprietary information.

As team leader on Plaintiffs' FX deal team, Usmar was a key leader and driver of Plaintiffs' competitive business and client relations. Through his employment with Moneycorp (and especially through his roles as Regional Sales Director, Regional Director/Account Manager, Director of U.S. Corporate Dealing, and ultimately Director of Corporate Dealing North America), he gained extensive knowledge of Plaintiffs' confidential and proprietary

1

information, including knowledge of the Plaintiff's sophisticated FX trading strategies and their clients' confidential information and trading history.

In these roles Usmar was responsible for Plaintiffs' largest revenue stream with *carte blanche* authority to assign Plaintiff's most lucrative clients, which he used to assign those clients to his own accounts managing a sizeable portion of Plaintiffs' book of business. In doing so, Usmar received substantial annual compensation largely driven by commissions based upon those clients' trades. Usmar profited handsomely from this position making a six-figure regular salary in addition to earning substantial commissions—specifically $209,954.31; $351,116.77; and $257,550.08 in commissions alone in his last three (3) years of employment. In order to do so, Usmar was trained in and provided access to Plaintiffs' substantial confidential and proprietary information and trade secrets. In exchange, Usmar agreed to two (2) employment agreements containing limited non-competition provisions, as well as non-disclosure and return of property provisions. In addition, Usmar accepted the opportunity to own specific shares in Moneta, which owns 100% of the equity in Moneycorp. Ownership of these shares would result in a significant windfall to Usmar when Moneta was ultimately sold to a third party. In exchange for this opportunity, Usmar executed an agreement that also contained non-competition and non-disclosure agreements.

In July 2023, following an investigation by Human Resources concerning certain allegations raised by multiple staff members, Usmar was allowed to resign from his employment with Moneycorp US Inc in lieu of termination. Despite written reminders of the above-referenced contractual obligations, Usmar accepted a position with Monex, Plaintiffs' primary competitor in North America. Monex and Usmar then began to leverage Usmar's knowledge of Plaintiffs' confidential and proprietary information—provided to him in order to benefit Plaintiffs', their clients, and ultimately Usmar himself—to poach the same lucrative clients that Usmar used to manage for and on behalf of the Plaintiffs.

Plaintiffs are requesting the immediate intervention of this Court to prevent the irreparable harm that they will continue to suffer if Usmar is permitted to continue to work for

2

4856-5384-1646.3

Plaintiffs' direct competitor and if both Defendants are allowed to continue to misappropriate and misuse Plaintiffs' confidential business information through Usmar's employment with Monex in breach of his contractual obligations to Plaintiffs. The requisite elements for injunctive relief are readily established here. First, the overwhelming evidence amply demonstrates that Plaintiffs are likely to succeed on the merits of their claims.[1] More particularly, the evidence described herein and submitted herewith demonstrates (and it is almost certain that additional evidence in Usmar and Monex's possession will show) that: (1) Usmar has breached and continues to breach his contractual agreements with both Plaintiffs by violating the binding and enforceable non-competition provision contained therein; and (2) Usmar has misappropriated Plaintiffs' confidential and proprietary information and trade secrets, and has used and threatens to continue to use that misappropriated information for his and Monex's benefit and to Plaintiffs' detriment, in violation of several restrictive covenants in his contractual agreements with Plaintiffs and state and federal law. The injunction Plaintiffs now seek is narrowly tailored to stop the harm that Usmar and Monex's improper and unlawful conduct is causing. Therefore, Plaintiffs' request for a temporary restraining order and preliminary injunction should be granted.

## FACTUAL BACKGROUND

### I.    Plaintiffs' Business and Competition with Monex USA

Moneycorp is a global business that provides Foreign Exchange (FX) services to individuals and business entities through its locally licensed subsidiaries such as Moneycorp US Inc., which has a money transmitter license throughout the United States and Canada. (*See* Affidavit of G. Thomas Anderson ("Anderson Aff.") ¶ 3; Verified Complaint ("Compl.") ¶ 7.)

---

[1] In support of this Memorandum, Plaintiffs rely upon relevant excerpts of the Verified Complaint, Exhibits attached to the Verified Complaint, and the contemporaneously filed Anderson Affidavit. Based on the highly sensitive and confidential business information contained in some of the documents misappropriated by Usmar, Plaintiffs reserve the right to produce additional evidence to demonstrate the types of confidential and proprietary information and trade secrets that Usmar misappropriated from Plaintiffs at the hearing on Plaintiffs' Motion, subject to procedures to maintain the secrecy of such information during and after the hearing.

4856-5384-1646.3

Monex is a direct competitor to Moneycorp in the United States and Canada as they provide similar FX services to the same target market. (Anderson Aff. ¶ 4.) Moneycorp and its competitors provide clients with two kinds of FX transactions: 1) payments-based and 2) hedging.

In a "payment-based trade," the customer purchases a currency and uses it to make a payment outside the United States in that currency. (Anderson Aff. ¶¶ 5–6.) "Hedging transactions" are more complex than "payment-based trades," are only available to those who qualify as "Eligible Contract Participants" under the Commodity Exchange Act and are the fastest growing aspect of Moneycorp's business. (Anderson Aff. ¶¶ 7–8 .) A significant part of the draw for clients who need hedging transactions is a provider's specialized knowledge of the FX markets, the various trading strategies available to the clients, and how those strategies affect various aspects of the client's balance sheet. (Anderson Aff. ¶ 10.)

## II.     Plaintiffs' Confidential and Proprietary Information and Trade Secrets

Plaintiffs' confidential and proprietary information and trade secrets have three (3) categories. The first is Plaintiffs' institutional specialized knowledge of the FX market, sophisticated techniques, etc. upon which their clients rely. (Anderson Aff. ¶ 26.) The second is client-related information which includes client contact information as well as knowledge of the client's confidential business and financial information they disclose to Moneycorp in the underwriting process. (Anderson Affidavit ¶ 15.) Most of this information is provided to Moneycorp under a Non-Disclosure Agreement. The contact information of these clients is often not publicly available. (Compl. ¶ 28.) The third is Moneycorp's internal economic information that comprises its business model such as pricing information, credit terms, collateral terms, underwriting process, margins on different currencies, and credit line limits. (Anderson Aff. ¶ 16.)

4856-5384-1646.3

### III.     Plaintiffs' Efforts to Protect their Confidential and Proprietary Information

Moneycorp takes a two-pronged approach to protect its Confidential and Proprietary information.  The first prong is designed to protect an internal breach of confidentiality.  This primarily involves the various policies and procedures to which each employee is bound to follow during their employment which include the signature of a narrowly tailored Confidentiality Agreement.  Those policies include Acceptable Use Policy, Data Protection Policy, Identity and Access Management Policy, Information Classification & Handling Policy, Information Sharing Policies and Procedures, and the Confidentiality and Nondisclosure of Trade Secrets section of Moneycorp's Employee Handbook.  (Compl. ¶¶ 9–11.)

The second prong is designed to protect Moneycorp's information from theft or compromise by an external actor.  Moneycorp's IT security protocols, which are externally audited with SOC2 and ISO27001 certifications, are designed to prevent confidential information from leaving Moneycorp's secure IT ecosystem such as requiring high level encryption of all messages, requiring the use of a Virtual Private Network to access company information, and limiting access to company information through company-issued devices.  (Compl. ¶¶ 11–12.)

### IV.     Usmar's Position with Moneycorp US Inc.

Usmar began working for Commonwealth FX Inc. ("Commonwealth") in 2009 at which time he attested to not having any FX related experience.  (Compl. ¶ 13; *see also* Exhibit A to the Verified Complaint ("Ex. A").)  At all times, the majority of Usmar's compensation was based on the transactions of the clients he managed.  (Anderson Aff. ¶ 17.)  By the time Moneycorp acquired Commonwealth, Usmar had been trained in the FX business and had risen to a management level with *carte blanche* authority to assign new customers to company FX dealers.  As expected of someone with this level of expertise and the trust of his employer, Usmar assigned the most lucrative clients to himself and managed a sizeable portion of the company's book of business.  (Anderson Aff. ¶¶ 23–25.)

4856-5384-1646.3

In 2019, Tom Anderson, Moneycorp's Managing Director of Corporate Dealing, trained Usmar in advanced knowhow of FX strategies, the advanced aspects of FX Options, more sophisticated currency risk management strategies, and institutional FX practices so that Usmar could assist Moneycorp's clients at a higher level and increase revenue.  This training also enabled Usmar to service higher caliber clients on Moneycorp's behalf.  (See Anderson Aff. ¶¶ 23–26.)  Following an investigation by Human Resources into the allegations raised by multiple staff members, Usmar was allowed to resign from his employment with Moneycorp in lieu of termination on July 18, 2023.  (Compl. ¶ 32; *see also* Exhibit E to the Verified Complaint ("Ex. E").)

### V.    Usmar's Contractual Incentive post-acquisition by Moneycorp

Moneycorp acquired Commonwealth by means of stock acquisition.  At that time, Usmar was considered a "key employee."  (Compl. ¶ 20.)  In 2018, Plaintiffs offered Usmar B-Shares in Moneycorp's ultimate parent company, Moneta, to induce Usmar to stay and help Moneycorp grow.  (Compl. ¶ 21.)  Accepting the B Shares was not a requirement for Usmar's continued employment with Moneycorp.  (Id.)  B Shares are non-voting stock which are exchanged for a significant payout if and when Moneycorp is acquired by a third party.  (Compl. ¶ 22; Anderson Aff. ¶¶ 19–21.)  Furthermore, B Shareholders are not required to remain employees at Moneycorp to keep their B Shares so long as they leave Moneycorp as a "good leaver" (*e.g.*, terminated for convenience).  (Anderson Aff. ¶ 21.)  If a B Shareholder is a "bad leaver" (*e.g.*, resignation or termination for cause), then they were contractually obligated to sell their B Shares back to Moneta at par value.  (Id.)

### VI.    Usmar's Restrictive Covenants

Usmar is under three (3) sets of restrictive covenants with Plaintiffs: 1) the Employee Agreement Regarding CONFEX Information and Related Matters that he signed in 2010 (the "First Commonwealth Agreement" attached to the Verified Complaint as Exhibit A ("Ex. A")),

the Employee Agreement Regarding Confidentiality of Commonwealth Information and Related Matters that he signed in 2015 (the "Second Commonwealth Agreement" attached to the Verified Complaint as Exhibit B ("Ex. B")) (collectively the "Employment Agreements"), and the Investment Agreement that he signed with Moneta to receive his B Shares (Attached to the Verified Complaint as Exhibit D ("Ex. D")).  All three (3) agreements require that Usmar protect his employer's Confidential Information during his employment and the two employment agreements required him to return and/or destroy all of his employer's Confidential Information in his possession when his employment ends.  (Ex. A ¶ 6; Ex. B ¶ 6.)

The Investment Agreement, for which he received consideration other than continued employment to sign, obligates him not to solicit Plaintiffs' customers, compete with or otherwise "harm the goodwill" of the Plaintiffs for twenty-four months after his employment ends, regardless of leaver status.  (Compl. ¶ 25; see also Ex. D.)  The Investment Agreement defines "Confidential Information" as "all information (whether oral or recorded in any medium) relating to any Group Company's business, financial or other affairs (including future plans of any Group Company) which is treated by a Group Company as confidential (or is marked or is by its nature confidential)."  (Ex. D ¶ 1.1.)  The Investment Agreement further defines "Group Company" to mean Moneta and any of Moneta's subsidiary companies, which includes Moneycorp.  (Id.) In executing the Investment Agreement, Usmar voluntarily agreed that he would "at all times" keep confidential the Confidential Information and "not at any time disclose or make known in any other way to anyone whomsoever or use for his own or any other person's benefit or to the detriment of [Moneycorp] any Confidential Information."  (Id. ¶ 10.1.8.)  Accordingly, the Investment Agreement further protects the specific information and restrictions contained within the Employment Agreements to which Usmar voluntarily agreed.  These three (3) agreements are collectively referred to herein as the "Restrictive Covenant Agreements."

## VII.    Monex Recruits Usmar and starts to steal Moneycorp Clients using Moneycorp's Proprietary Information

7

In June, 2024, Moneycorp sent Usmar a "reminder of rights" letter in response to a rumor that Usmar received an employment offer from Monex. (Compl. ¶ 34; see also Exhibit F to the Verified Complaint ("Ex. F").) On September 11, 2024, Monex announced on LinkedIn that Usmar had joined their dealing team. (Compl. ¶ 36; *see also* Exhibit G to the Verified Complaint ("Ex. G").) The only reason why Monex would hire Usmar would be the prospect of poaching a large portion of Moneycorp's book of business. (Anderson Aff. ¶ 31.) On that same day, Moneycorp started to receive communications from its clients who previously worked with Usmar that Usmar had reached out to them by emails and phone calls seeking to induce those customers to stop doing business with Moneycorp and bring their business to Monex. (Compl. ¶ 38.) Many of these clients' contact information is not publicly available, accordingly, Monex and Usmar would not have been able to contact these clients but for Usmar's prior employment with Moneycorp. (Compl. ¶¶18, 42).

On September 13, 2024, Moneycorp sent both Usmar and Monex a letter demanding that they cease and desist their improper solicitation of Moneycorp's clients. (Compl. ¶ 39.) Since then, however, Moneycorp has received additional communications from clients that Usmar is soliciting them on behalf of Monex. One client specifically stated that Usmar offered to "improve the spread" (*i.e.*, get a better price) for the client with Monex, which he could only know with an intimate knowledge of the clients' trading history and Moneycorp's internal pricing model. (Anderson Aff. ¶¶ 31-33.)

The table included within the Anderson Affidavit lists the Moneycorp clients that Usmar has recently solicited and the annual revenue to Moneycorp from those clients that Usmar and Monex are attempting to steal. (Anderson Aff. ¶ 34.) As established by the Anderson Affidavit, these losses are not speculative as clients from this list have already provided Plaintiffs with notice that they will no longer need Plaintiffs' services following Usmar's employment with Monex. (Id. ¶ 35.)

4856-5384-1646.3

## ARGUMENT

### I.    Legal Standard for Issuance of a Preliminary Injunction

"In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." CVS Pharmacy, Inc. v. Lavin, 384 F. Supp. 3d 227, 237 (D.R.I. 2019) (quoting Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013)).  "While the district court must weigh all four of the [preceding] factors, courts place particular emphasis on the first requirement: the plaintiff's likelihood of success on the merits." Get in Shape Franchise, Inc. v. TFL Fishers, LLC, 167 F. Supp. 3d 173, 198 (D. Mass. 2016) (citing Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012); Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006)).  "To establish a likelihood of success on the merits, the district court need only determine the 'probable outcomes' of the underlying claims." Id. (citing Maine Educ. Ass'n Benefits Trust v. Cioppa, 695 F.3d 145, 158 (1st Cir. 2012)).  Additionally, courts in the First Circuit "measure irreparable harm on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits . . . such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Perficient, Inc. v. Priore, 2016 U.S. Dist. LEXIS 56704, at *13-14 (D. Mass. Apr. 26, 2016) (quoting Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 42-43 (1st Cir. 2010)).  In light of these standards, the facts before the Court clearly warrant the issuance of a preliminary injunction.

The standard for the issuance of a TRO is identical to the standard applied for preliminary injunctions. Kellam v. Burnley, 673 F. Supp. 71, 72 (D.R.I. 1987).  In light of these standards, the facts before the Court articulated in Plaintiffs' Verified Complaint and exhibits, along with the attached declaration, clearly warrant the issuance of a TRO and preliminary injunction.

4856-5384-1646.3

Moreover, the unauthorized use or disclosure of a trade secret—whether actual or threatened—may be enjoined pursuant to the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836(b)(3)(A), and the Rhode Island Uniform Trade Secrets Act ("RIUTSA"), R.I. Gen. Laws § 6-41-2.  Additionally, alongside the Court's independent authority under Fed. R. Civ. P. 65, 18 U.S.C. § 1836(b)(3)(A), and R.I. Gen. Laws § 6-41-2, the injunctive relief sought by Plaintiffs is explicitly supported by their respective contractual agreements with Usmar, which Usmar signed.  All three agreements Usmar executed with the Plaintiffs contain terms to which Usmar agreed that his breach of any of the respective agreements would cause irreparable harm, injury and damage for which monetary damages are inadequate and that that Plaintiffs' would be entitled to an injunction restraining such breach without the need to prove actual damage and without positing bond or other security.  (Ex. A ¶ 10; Ex. B ¶ 10; Ex. D ¶ 10.5.) Therefore, the Court should grant this Motion in its entirety.

## II.    Plaintiffs' are Likely to Succeed on the Merits[2]

### A.    Plaintiffs are Likely to Succeed on their Breach of Contract Claims

#### 1.    Usmar Breached the Terms of the Restrictive Covenant Agreement

Plaintiffs have established a likelihood of success on their breach of contract claim.  To establish breach of contract, a plaintiff must show that a valid agreement existed between the parties, Usmar breached the agreement(s), and the breach caused injury to the plaintiff.  Barkan v. Dunkin' Donuts, Inc., 627 F.3d 34, 39 (1st Cir. 2010) (citing Petrarca v. Fid. & Cas. Ins. Co., 884 A.2d 406,410 (R.I. 2005)).

As discussed in Section II(A)(2), the Restrictive Covenant Agreements are valid, binding, and enforceable.  Usmar breached the Restrictive Covenant Agreements in numerous ways. First, he breached their non-competition provisions, pursuant to which he expressly agreed that

---

[2] Plaintiffs are likely to succeed on all claims asserted in its Complaint.  For the purposes of this Motion, Plaintiffs discuss three of their claims that warrant the issuance of a preliminary injunction.

4856-5384-1646.3

Usmar would not (either directly or indirectly, by assisting or acting in concert with others) Compete with the Plaintiffs during the Restricted Period within the Restricted Territory.  (*See* Ex. A ¶ 9; Ex. B ¶ 9; Ex. D ¶¶ 10.1.3, 10.1.4.)  Federal courts have recognized that employees can violate a non-compete covenant prior to officially starting employment with a new employer. See e.g., CPI Card Grp., Inc. v. Dwyer, 294 F. Supp. 3d 791, 815 (D. Minn. 2018) (finding defendant had likely violated the non-solicitation and non-compete covenants with former employer least by using and discussing former employer's confidential information with new employer prior to official start of new employment).  Usmar cannot simply delay his official hire date in order to ostensibly avoid the restrictive periods of his two Employment Agreements.  As discussed below, Usmar's conduct for and on behalf of himself and Monex satisfies each term of these provisions, as follows:

- The Agreement defines Usmar's prohibited competitive conduct to mean that he will not "directly or indirectly, at any time during the Relevant Period, solicit the custom of or deal with any person, firm or company with whom he had any dealings (other than in a de minimis way) at any time during the period of 12 calendar months prior to the Relevant Date so as to compete with or harm the goodwill of the Company or [Moneycorp] during such period."  (Ex. D ¶ 10.1.4.)  Usmar's employment with Monex and his conduct in soliciting Plaintiffs' customers is in direct violation of this term.  Usmar has, and continues to, solicit Plaintiffs' customers to move their respective business from Plaintiffs to Usmar's new employer Monex. Accordingly, there is more than sufficient evidence that Usmar is engaging in competition with Plaintiffs through his employment with Monex, as defined within the Restrictive Covenant Agreements.

- The Investment Agreement defines the term "Restricted Period" to mean the entire term of Usmar's employment with Moneycorp and a two (2) year period

11

following termination of his employment. (Ex. D ¶ 10.8.3.) Usmar was rumored to be working with Monex in June 2024, but following the Reminder of Rights letter, did not officially announce his employment until September 2024. (Anderson Aff. ¶ 29; Compl. ¶ 36.) The September announcement and the concomitant employment specifically breaches the Investment Agreement's agreed to Restricted Period.

- The Restrictive Covenant Agreements defined the "Restricted Territory" to mean North America and Usmar acknowledged that "the foreign currency exchange business is an international business by nature, and that restriction from working in said business within North America is a reasonable restriction." (Ex. A ¶ 9; Ex. B, ¶ 9). Accordingly, Usmar admitted that Plaintiffs are a global business, offering services across the world, and that restricting his ability to compete with Plaintiffs within North America is reasonable.[3]

Accordingly, Usmar is competing within the Restricted Territory, as that term is defined by the Restrictive Covenant Agreements.

In addition to his breach of the non-competition provision, Usmar is in breach of the non-disclosure provisions of the Restrictive Covenant Agreements. As explained above, Usmar has extensive knowledge of Plaintiffs' confidential and sensitive information and has clearly used, and inevitably will continue to disclose, such information in his employment with Monex. Indeed, the evidence demonstrates that Usmar has already done so by using that confidential information poach Plaintiffs' most lucrative customers to Monex. While he has been successful in doing so, even if he were not, the simple act of attempting to do so violates the Restrictive Covenant Agreements. What is worst of all is that Usmar and Monex have engaged in this conduct despite numerous written reminders and warnings that such conduct is in violation of the Restrictive Covenant Agreements.

---

[3] The Restricted Territory is North America; and, even if it were narrower, Usmar worked in Rhode Island for Plaintiffs and continues to work in Rhode Island for Monex. He cannot dispute that he was (and is) within the geographic scope of the Restrictive Covenant Agreements.

4856-5384-1646.3

## 2.   The Restrictive Covenant Agreements are Binding and Enforceable

To enforce a restrictive covenant under Rhode Island law, a plaintiff must show that "(1) the provision is ancillary to an otherwise valid transaction or relationship; (2) the provision is supported by adequate consideration; and (3) it has a legitimate interest that the provision is designed to protect." R.J. Carbone Co. v. Regan, 582 F. Supp. 2d 220, 224 (D.R.I. 2008).

Here, the Restrictive Covenant Agreements were ancillary to Usmar's employment and supported by adequate consideration. Usmar first executed the First Commonwealth Agreement on March 3, 2010, in connection with his initial employment with Commonwealth, which eventually became Moneycorp. (*See* Ex. A.) Thereafter, Usmar reaffirmed his obligations when he executed the Second Commonwealth Agreement on January 15, 2015. (*See* Ex. B.) After Commonwealth was acquired by Moneycorp, Usmar accepted his Moneta B Shares and their potential future substantial payment in exchange for further committing himself to these restrictive covenants. Usmar's initial hire, continued employment, and receipt of B Shares worth substantial value all provided sufficient consideration to support the Restrictive Covenant Agreements.[4]

Plaintiffs have a legitimate interest in protecting their confidential information and the goodwill they derive from such confidential information, which plainly support all of the restrictive covenants within the Restrictive Covenant Agreements. Citing to Rhode Island law, this Court has noted:

> The "crucial issue" in considering the enforceability of a non-competition agreement is its "reasonableness." Reasonableness of non-competition agreements "turns on: (1) whether the provision is narrowly tailored to protect the legitimate interests; (2) whether it is reasonably limited in activity, geographic area, and time; (3) whether the promisee's interests are not outweighed by the hardship to the promisor; and (4) whether the restriction is likely to injure the public.
> ….

---

[4] Rhode Island courts hold that continued employment provides adequate consideration to support a non-compete agreement. R.J. Carbone Co. v. Regan, 582 F. Supp. 2d 220, 224 (D.R.I. 2008); Aim High Acad., Inc. v. Jessen, 2008 WL 5325586 (R.I. Super. Ct. Dec. 10, 2008)).

13

4856-5384-1646.3

In the end, the reasonableness "must be decided on the facts of the case within the framework of these limitations." However, reasonableness is "ultimately a question of law to be determined by the court." Rhode Island courts may modify or "blue-pencil" non-competition agreements to make them reasonable and enforceable.

CVS Pharmacy, Inc. v. Lavin, 384 F. Supp. 3d 227, 236 (D.R.I. 2019) (citing F. Saia Restaurants, LLC v. Pat's Italian Food to Go, Inc., 2012 WL 2133511, at *7 (R.I. Super. June 06, 2012) (citations omitted)).

The non-competition provisions within the Restrictive Covenant Agreements are tailored to serve Plaintiffs' legitimate interest in protecting their confidential information and goodwill, and they are each reasonable in duration and scope. Rhode Island courts routinely enforce restrictive covenants that have durations of 12 months and longer. Block v. Vector of Warwick, LLC, 2000 WL 1634784, at *6 (R.I. Super. Ct. May 19, 2000) (enforcing two-year non-competition provision); CVS Pharmacy, Inc., 384 F. Supp. 3d at 236 (enforcing 18-month non-competition provision). The two-year duration is reasonable and is tied to Plaintiffs' interest in protecting the extensive knowledge of Plaintiffs' confidential information that Usmar gained through his employment with Moneycorp and/or any other "Group Company" owned by Moneta, including Moneycorp. In this case, Plaintiffs' have bargained for the ability to preserve the confidentiality of their proprietary business information and protect themselves against unfair competition. Under the circumstances of this case and Rhode Island law, the 24-month restriction is reasonable.

The geographic restriction of the non-competition provisions are likewise reasonable. Moneta is a global business that offers services across the United States and Canada through Moneycorp. As Plaintiffs' key deal team leader rising to the position of Director, Corporate Dealing North America, Usmar serviced a significant number of Moneycorp's most lucrative clients and had developed an intimate knowledge of Moneycorp's entire client base due to his length of service and supervision Moneycorp US's other FX dealers. (Anderson Aff. ¶ 28.) In light of Usmar's managerial role and his position as a key leader of Plaintiffs' North American deal team, it is reasonable to restrict him from competing with Plaintiffs throughout North

14

4856-5384-1646.3

America.  Allen v. Creative Servs., Inc., 1992 WL 813643, at *3 (R.I. Super. July 6, 1992) (enforcing non-competition provision applicable to "the area where [the employee] performed services during her employment with [the employer]" because the employer was attempting to protect its legitimate business interests with such a provision); see also Cranston Print Works Co. v. Pothier, 848 A.2d 213, 220 (R.I. 2004) (lack of geographic restriction enforceable if Plaintiff shows its business is international in character and that such an unlimited geographic restraint on defendant's future business activities is reasonable in light of plaintiff's worldwide competitive activities).[5]

The reasonableness of the non-competition provision is further supported by the Agreements' specific and narrow definition of prohibited conduct to protect its legitimate interests by limiting it to the specific business and customers with whom Usmar had dealt while working for and on behalf of the Plaintiffs.  See CVS Pharmacy, Inc., 384 F. Supp. 3d at 237 (concluding that a non-competition provision prohibiting employment in "the same or similar in function or purpose" was specific, narrow, and reasonable).  Usmar is free to seek and gain employment with an employer that develops products or services in other industries and markets. But, it is certainly reasonable to prohibit Usmar, as he agreed, from working with Plaintiffs' direct competitor while actively soliciting Plaintiffs' most lucrative customers to whom Usmar only gained access and information based upon his key role (and subject to his specific agreement to the Restrictive Covenant Agreements) with Plaintiffs.

Accordingly, the Restrictive Covenant Agreements are each binding and enforceable, and Plaintiffs are likely to succeed on their claims that Usmar breached these agreements.

---

[5]  Indeed, in light of Usmar's role with Monex, if the Court were to conclude that a narrower geographic scope should apply, Monex could simply relocate Usmar outside of that geographic area.  In any other location, Usmar would be able to perform the same role and unfairly compete with Plaintiffs in the same way that he can while physically located in Rhode Island.

4856-5384-1646.3

**B.** ***Plaintiffs are Likely to Succeed on their Defend Trade Secrets Act Claim[6]***

The DTSA provides that actual or threatened misappropriation of trade secrets may be enjoined. 18 U.S.C. § 1836(b)(3)(A). Plaintiffs are likely to succeed on their claim against Usmar under the DTSA because Usmar has already committed an "actual" misappropriation and "threaten[s]" to further misappropriate Plaintiffs' trade secrets. The indisputable evidence establishes that Usmar improperly retained confidential information and trade secrets and took that information with him when he left Moneycorp. The evidence further establishes that Usmar has otherwise used and disclosed trade secrets known to him to unfairly compete with Plaintiffs. Thus, just as Usmar's misappropriation, disclosures, and unauthorized use of Plaintiffs' proprietary information violated his non-disclosure agreement, it also violates the DTSA, and Plaintiffs are likely to succeed on that claim. See Henry Schein, Inc. v Cook, 2016 U.S. Dist. LEXIS 81369, at *16-17 (N.D. Cal. June 22, 2016) (holding that obtaining trade secrets in breach of a confidentiality agreement constitutes misappropriation under DTSA).

The DTSA provides protection for misappropriation of a "trade secret," and defines that term in 18 U.S.C. § 1839(3) as follows:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if— (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

---

[6] Notably, Usmar's breach of the non-competition and non-disclosure provisions of the Restrictive Covenant Agreements are sufficient to support all of the relief sought in the Motion for Temporary Restraining Order and Preliminary Injunction. Accordingly, if this Court concludes, as it should, that Plaintiffs are likely to succeed on their breach of contract claims, it need not determine whether Plaintiffs are likely to succeed on the merits of their DTSA and RIUTSA claims – which they are.

4856-5384-1646.3

**1.    Plaintiffs' Proprietary Information Constitutes a Trade Secret**

Usmar's use of his extensive knowledge of Plaintiffs' trade secrets on behalf of Monex constitutes misappropriation of a variety of types of information that readily meet the threshold to constitute trade secrets under the DTSA:

- Plaintiffs' proprietary information concerning its specialized knowledge of the FX market and sophisticated techniques upon which their clients rely, constitute "business, scientific, technical, … or engineering information, patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, [or] procedures."  18 U.S.C. § 1839(3); T&S Brass & Bronze Works, Inc. v. Slanina, 2016 WL 11201768, at *6 (D.S.C. Dec. 20, 2016), report and recommendation adopted as modified, 2017 WL 927948 (D.S.C. Mar. 9, 2017) (stating that "product designs, sales, and other financial data, and customer information" are categories of information that "clearly fall[] within the DTSA definition of trade secrets").

- Plaintiffs' proprietary information concerning their client-related information which includes client contact information as well as knowledge of the client's confidential business and financial information they disclose to Moneycorp in the underwriting process under non-disclosure agreements, and customer-specific information (including preferences, needs, costs, profits, and purchasing histories), constitute "financial, business, … [or] economic … information, including patterns, plans, compilations, … [or] formulas." 18 U.S.C. § 1839(3).

- And, Plaintiffs' internal economic information that comprises its business model such as pricing information, credit terms, collateral terms, underwriting process, margins on different currencies, and credit line limits,

17

4856-5384-1646.3

constitute "financial, business, … [or] economic … information, including … plans [or] compilations." 18 U.S.C. § 1839(3).

Furthermore, in light of Usmar's and Monex's conduct, Usmar cannot in good faith dispute that Plaintiffs "[d]erive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). The fact that Plaintiffs' trade secret information derives its independent economic value from not being readily ascertainable by proper means is demonstrated by the fact that *Defendants used improper means to get it*. Indeed, if Monex could gain access to Plaintiffs' proprietary information through proper means, it would have no reason to retain and utilize Usmar to poach Plaintiffs' customers. The timing of these recent customer defections in addition to the various communications from customers informing Plaintiffs that Usmar was actively recruiting these customers for and on behalf Monex clearly demonstrates that Monex (through Usmar) has already attempted to "obtain economic value from its disclosure or use" by using the various details known to Usmar to develop competitive advantage and otherwise compete for Plaintiffs' customers. This evidence is only further supported by the fact that despite numerous written warnings, Usmar and Monex are continuing to leverage Plaintiffs' trade secrets to poach customers and their conduct demonstrates that they do not intend to stop. Moreover, Plaintiffs derive independent economic value from their confidential information and pricing terms concerning Plaintiffs' client provided information and Plaintiffs' credit terms, collateral terms, underwriting process, margins on different currencies, and credit line limits. Usmar's knowledge and misappropriation of this information puts him in a position to unfairly compete with Plaintiffs by undercutting Plaintiffs' relationships with these clients and offering these clients discounted rates and more favorable credit terms than Usmar knew these clients received with Plaintiffs. Plaintiffs do not have access to the intimate details of Monex's plans, strategies, financial terms, or its agreements with its customers, and Usmar and Monex should not be

18

permitted to continue to utilize those sensitive details about Plaintiffs' business to unlawfully compete with them.

Finally, Plaintiffs took reasonable measures to ensure the secrecy of its confidential information. "To determine whether a company took reasonable steps to protect its trade secrets, courts consider 1) the existence or absence of a [confidentiality agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable." Optos, Inc. v. Topcon Med. Sys., 777 F. Supp. 2d 217, 239-40 (D. Mass. 2011) (applying the DTSA and parallel state law) (internal quotations omitted). "[T]he standard is reasonableness, not perfection" and "a company need not take 'heroic measures' to preserve the confidentiality of its trade secrets." Id. at 240 (citation omitted).

Here, Plaintiffs' precautions readily meet the reasonableness standard. Moneycorp requires all of its employees and executives to execute agreements containing confidentiality, non-solicitation and non-competition covenants. (See Ex. A; Ex. B.) Moneta required all individuals accepting B Shares to do the same. (Ex. D ¶¶ 10–11.) Plaintiffs also maintained a System Security Policy in its Employee Handbook. This policy required the confidential treatment and protection of Plaintiffs' Proprietary Information by prohibiting employees from accessing files that they do not have permission to access, prohibiting employees from using personal devices or accounts for conducting Plaintiffs' business and further specifically prohibiting the unauthorized review, duplication, dissemination, removal, damage, or alteration, or improper use of Plaintiffs' confidential information and trade secrets. (Compl. ¶¶ 10–11.) Plaintiffs further protected their confidential information by requiring all employees, including Usmar, promptly upon termination of employment, to return all of Plaintiffs' property and information. (Ex. A ¶ 6; Ex. B ¶ 6; Ex. D ¶ 11.3). Plaintiffs' confidential and proprietary information was not (and is not) generally known to the public, and Usmar only had access and permission to use the confidentiality and trade secrets to perform his duties within his key managerial role with Plaintiffs. (Anderson Aff. ¶ 16; Compl. ¶¶ 27–28.)

19

**2.    Usmar Misappropriated and/or Threatened Misappropriation of Plaintiffs' Trade Secrets**

The evidence overwhelmingly demonstrates that Usmar misappropriated and threatened further misappropriation of Plaintiffs' trade secrets in a multitude of ways.  "Misappropriation" under the DTSA can be established by disclosure or use of a trade secret "without express or implied consent by a person who—(i) used improper means to acquire knowledge of the trade secret; [or] (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was … acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret …" 18 U.S.C. § 1839(5)(B).  The DTSA provides the actual or threatened misappropriation of trade secrets may be enjoined. 18 U.S.C. § 1836(b)(3)(A).

It is indisputable that Usmar did not have either Plaintiffs' "express or implied consent" to disclose his extensive knowledge of Plaintiffs' trade secrets and that such trade secrets were "acquired under circumstances giving rise to duty to maintain the secrecy of the trade secret or limit the use of the trade secret."  Usmar signed three separate agreements that expressly prohibited such disclosure.  Furthermore, Plaintiffs made Usmar well aware of his duties to maintain the confidentiality of Plaintiffs' information and return it upon his termination from employment through the numerous confidentiality agreements he executed throughout his employment with Moneycorp (and its predecessor, Commonwealth), the System Security policy in the Employee Handbook, and his acceptance of B Shares in Moneta.  Usmar acquired these trade secrets through his employment in an executive capacity as a key leader of Plaintiffs' competitive strategy, and he cannot reasonably dispute that he acquired this extensive knowledge under circumstances giving rise to a duty to keep the information confidential.

Usmar was also made aware of these duties when he received both a reminder of restrictive covenants in addition to a cease and desist letter specifically demanding that he not disclose Plaintiffs' confidential information.  Nevertheless, Usmar has intentionally used his knowledge of Plaintiffs' trade secrets and confidential information on behalf of Monex, as

20

evidenced by his communications to Moneycorp clients concerning competition with Moneycorp.[7] And, even aside from this actual misappropriation, the rascality demonstrated by Usmar and Monex exposes their further threatened misappropriation of Plaintiffs' trade secrets. Despite numerous warnings, Defendants are continuing to leverage Plaintiffs' misappropriated trade secrets to poach Plaintiffs' most lucrative customers. Usmar's actual misappropriation of Plaintiffs' trade secrets, as described herein is sufficient to establish threatened misappropriation.

> **C.**      *Plaintiffs Are Likely to Succeed on their Rhode Island Trade Secrets Act Claims*

The Rhode Island Uniform Trade Secrets Act ("RIUTSA") provides for injunctive relief for the misappropriation of trade secrets. R.I. Gen. Laws. § 6-41-1, *et seq*. "'Misappropriation' means: (i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (ii) Disclosure or use of a trade secret of another . . ." Alifax Holding SpA v. Alcor Sci. LLC, No. 2022-1641, 2024 WL 2932910, at *6 (Fed. Cir. June 11, 2024) (citing R.I. Gen. Laws § 6-41-1). For the purposes of RIUTSA, "trade secret" is defined, in relevant part, as "information … that [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." R.I. Gen. Laws § 6-41-1(4)(i). Trade secrets must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id*. at § 6-1-41(4)(ii). As discussed in more detail above, Plaintiffs' Confidential Information constitutes a trade secret that is protectable under RIUSTA, just as it is protectable under DTSA. Notably, this Court has found that stipulating communications, such as emails, as "confidential company policy" satisfied the "reasonable efforts" requirement under RIUSTA. Alifax Holding SpA v. Alcor Sci., Inc., No. CA 14-440 S, 2015 WL 5714727, at *4 (D.R.I. Sept. 29, 2015) Plaintiffs' efforts go beyond stipulating

---

[7] Based upon the incriminating circumstances presented here, Plaintiffs expect that further discovery (including document requests and depositions from both Defendants) will reveal additional actual use and disclosure of Plaintiffs' trade secrets.

4856-5384-1646.3

communications as "confidential."  Plaintiffs ensure their trade secrets are confidential through its restrictive covenants and confidentiality policies with their employees and B Shareholders.

Under RIUTSA, misappropriation of a trade secret constitutes:

> disclosure or use of a trade secret of another without express or implied consent by a person who: (B) At the time of the disclosure or use, knew or had reason to know, that his or her knowledge of the trade secret was: (II) acquired under circumstances giving rise to a duty to the person seeking relief to maintain its secrecy or limit its use.

R.I. Gen. Laws § 6-41-1(2)(ii)(B)(II).  As discussed above, Usmar acquired access to trade secrets during the course of his employment at Moneycorp.  He was aware of the Confidential Information's confidential nature.  He assumed a duty to maintain its secrecy in signing the Agreement.  Even if Usmar promises not to explicitly reveal Plaintiffs' trade secrets, he will inevitably disclose them in the course of his employment at Monex.  Usmar's knowledge of Plaintiffs' trade secrets will shape his decisions for and on behalf of Monex.  For these reasons, Plaintiffs are likely to succeed on their RIUTSA claim.

## III.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

First, Plaintiffs have suffered, and will continue to suffer, irreparable harm and lack of an adequate remedy at law through Usmar's breach of his non-competition and nondisclosure provisions of the Restrictive Covenants Agreement and misappropriation of Plaintiffs' trade secrets and other confidential information.  Under Rhode Island law, the risk of disclosure of confidential information to a competitor "presents a sufficient risk of irreparable harm to justify a preliminary injunction."  CVS Pharmacy, Inc., 384 F. Supp. 3d at 237 (citing Saban v. Caremark Rx, LLC, 780 F. Supp. 2d 700, 731 (N.D. Ill. 2011) ("Rhode Island courts have enjoined former employees when the employee's knowledge of confidential information is likely to damage the former employer.")); Allen, 1992 WL 813643, at *2 (employees' knowledge of training manuals, investigative techniques, confidential sources, and client needs in investigative firm "would be disastrous" to the employer were the employees able to immediately open their own private investigation business); City Hall Elec. Supply, Inc. v. Rossi, 1988 WL 1017316 at *2 (R.I.

4856-5384-1646.3

Super. Mar. 2, 1988) (CEO was properly enjoined from competing for three years within the state because he was going to perform "the same work" for a competitor and admittedly possessed tangible confidential information from old employer); Harlan Labs., Inc. v. Campbell, 900 F. Supp. 2d 99, 108 (D. Mass. 2012) ("As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm."). Moreover, in accordance with settled Rhode Island law, the damage to Plaintiffs' goodwill from Usmar's use of Plaintiffs' confidential and proprietary information "is precisely the type of irreparable injury for which an injunction is appropriate." Iggy's Doughboys, Inc. v. Giroux, 729 A.2d 701, 705 (R.I. 1999).

There is no way at the present time to ascertain the degree of loss that Plaintiffs' will sustain by Usmar's breaches of his contractual obligations, including both (i) his misappropriation of Plaintiffs' confidential information and trade secrets from his company-provided computers; and (ii) his inevitable (and apparent) disclosure of other trade secret information to Monex and his own use of such information in his capacity and employment with Monex. Absent entry of immediate injunctive relief, Plaintiffs stands to lose their position as the leader in foreign exchange services, and the goodwill they have generated with respect to their many customers will be seriously jeopardized if they are forced to compete with Monex while Monex uses Plaintiffs' Proprietary Information through its employment of Usmar in violation of his agreements with the Plaintiffs.

Moreover, it is impossible to determine at this time how much damage may be caused, how many customers will be lost, and whether any such customers will ever return to Plaintiffs if Usmar and Monex are allowed to act in complete disregard of Usmar's contractual obligations and continue to compete unfairly with Plaintiffs. Plaintiffs are highly likely to continue to suffer irreparable harm if injunctive relief does not issue. The impracticability of assessing the monetary value of such harm renders the harm irreparable and warrants the imposition of injunctive relief to enforce Usmar's contractual and statutory obligations.

23

4856-5384-1646.3

Every day that Usmar works for Monex with full, extensive knowledge of Plaintiffs' confidential information and trade secrets that do not belong to him, Plaintiffs' Proprietary Information and goodwill are at risk of misappropriation and damage. Simply put, without an injunction, Plaintiffs have no remedy sufficient to protect their Proprietary Information or customer goodwill. This loss constitutes irreparable harm that cannot be precisely quantified, for the reasons discussed above.

IV.    **The Balance of the Equities Weighs in Plaintiffs' Favor**

The equities weigh in favor of issuing an injunction. This is particularly true where, as here, Usmar received substantial compensation, for example his approximately $1,224,585 in just his last three years of employment and the potential windfall in the event of Moneta's sale to a third-party (which Usmar received in exchange for agreeing to the limited restrictions on future employment). Yet, Usmar resigned from Moneycorp and sought alternative employment at Plaintiffs' direct competitor where he knew that Plaintiffs' Proprietary Information will be at risk. See CVS Pharmacy, Inc., 384 F. Supp. 3d at 237–38. Simply put, rewarding Usmar and Monex for planning to unlawfully compete with Plaintiffs certainly would not be equitable.

It is equitable to prohibit Usmar to abide by the deal he struck with Plaintiffs as Plaintiffs promoted him, educated him concerning the necessary strategies and confidential information necessary to increase profits, which all resulted in his increased compensation over time. Usmar knew when he took the Monex job that he was at risk of being precluded from staying in that job because of the agreements with the Plaintiffs. He is free to seek and gain employment with any employer that develops products or services in other industries and markets. The injunction would allow him to seek such other employment while preventing him from capitalizing on his breaches of contract and violations of statutory duties to date, and from unfairly competing with Plaintiffs. For all the foregoing reasons, the balance of harm tips decidedly in Plaintiffs' favor.

4856-5384-1646.3

## V.       Public Policy Will Not Be Adversely Affected by Issuance of an Injunction

"[T]he public has a strong interest in preserving the integrity of contracts and protecting confidential business information from competitors." CVS Pharmacy, Inc., 384 F. Supp. 3d at 238.  In addition, where, as here, an employee has violated a non-competition agreement, an injunction is in the public interest.  EMC Corp., 2010 WL 5187764, at *7 ("Insofar as the public has a general interest in ensuring individuals the opportunity to carry on work without undue interference while also guaranteeing companies protection for their confidential or proprietary information, issuing the injunction furthers both ends.").  Accordingly, the public interest will not be adversely affected by the issuance of a Temporary Restraining Order and Preliminary Injunction against Usmar and Monex because it would preserve the integrity of contracts as Usmar has violated a non-competition agreement.

## CONCLUSION

Plaintiffs seek the assistance of this Court to protect them from unfair competition and to protect their confidential and proprietary information and trade secrets from misappropriation. In doing so, they are simply seeking enforcement of the clear terms of the Restrictive Covenant Agreements and Usmar's independent statutory duties.  Based on the cited authorities and the facts before the Court, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction should be allowed.

4856-5384-1646.3

Respectfully submitted,

Plaintiffs,
MONEYCORP US INC. and
MONETA TOPCO LIMITED,
By their Attorneys,


/s/ William H. Wynne, IV
William H. Wynne, IV (#9020)
NIXON PEABODY LLP
One Citizens Plaza, 5th Floor
Providence, RI  02903
Tel:    (401) 454-1127
Fax:    (844) 277-6379
Dated:  October 16, 2024                    Email: wwynne@nixonpeabody.com


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 16, 2024.

/s/ William H. Wynne

26

4856-5384-1646.3